Caroline K. Simon, J.
On the morning of December 22,1966, claimant, in this action for negligence of the State of New York, was traveling by subway from his home in Far Bockaway to his office in midtown Manhattan. His usual mode of travel was by car, but on this particular morning his wife required the car’s use to transport lamps and other breakables to the new home to which they were moving the following day.
At about 7:45 a.m., Mr. Orman changed trains at the Broadway and Nassau Street station from the Independent to the Lexington Avenue line. He testified that he walked up the stairs leading to the east side train. As he reached the top landing of the flight of steps he heard a loud report and simultaneously felt sharp pain in the lower center of his back. He fell down. Police were summoned. Mr. Orman was taken to Beekman Downtown Hospital where the injury was diagnosed as a gunshot wound with resultant paraplegia of both limbs.
As a result of police investigation and interrogation of bystanders who had caught glimpses of a suspect, on January 19, 1967 a patient of Central Islip State Hospital who had been on home leave since December 12, 1966, was arrested. Thereafter he was indicted by a Grand Jury. The patient was represented by counsel, according to the police sergeant present there and a witness at this trial. He has not been brought to trial, *338 due to his admission to Matteawan State Hospital in Beacon, New York.
The claim, timely filed with the Clerk of the Court of Claims and in the Department of Law on March 3, 1967, alleges negligence of the Central Islip authorities in permitting a patient to leave the premises for a home visit as the proximate cause of Mr. Orman’s injuries. It seeks'$1,000,000 as damages for personal injuries and suffering, plus medical and hospital expenses undetermined at the time of filing.
The claim has neither been tried, nor assigned, nor brought before any other court or tribunal for determination.
At the commencement of the trial, the Attorney-General objected to the introduction of any evidence pertaining to the identity or the apprehension of the suspect, on the theory that he was under indictment and that his civil rights in any subsequent trial would be in jeopardy should evidence now be introduced in a civil action that would pertain to his guilt or innocence. As precedent for this position, Lewis v. Roux Trucking Corp. (222 App. Div. 204) and Zara Contr. Co. v. State of New York (22 A D 2d 415) were cited.
The court recognizes that the rights of an accused are and ought to be zealously protected by every safeguard afforded in our system of jurisprudence, based as it is on common law, case law and statute. The cases cited by the State, however, relate to the disclosure of prior criminal proceedings in a pending civil action whereas the Attorney-General’s objection in the instant matter is based upon the possible use of testimony in a civil court proceeding as a basis for a future criminal trial.
Our rules of evidence require the accused to have an opportunity to cross-examine; they prevent the admission of any testimony against one who is not a party to the proceeding; and such testimony may be objected to as inadmissible in the later trial, even if no objection had been interposed in the earlier action. Because of these safeguards the court followed the path illuminated by Judge Fuld in Fleury v. Edwards (14 N Y 2d 334, 341): ‘ ‘ Absent some strong public policy or a clear act of pre-emption by the Legislature, rules of evidence should be fashioned to further, not frustrate, the truth-finding function of the courts in civil cases.”
In the interest of justice and in order to permit claimant to have his day in court, testimony by the police assigned to the criminal case was admitted over the State’s objection.
A sergeant on radio patrol stated that he received a call at 7:45 a.m. that “ shots were fired ” at the Broadway and Nassau Street subway station. He reported to the scene, the entrance *339 being on the south side of Fulton Street, and saw claimant in a prone position. He asked Mr. Orman whether he could get up, and was told that he could not. He ordered the ambulance in which claimant was removed to Beekman Downtown Hospital. A police “Aided” card was filled out by a patrolman at his direction, and was stated by the sergeant to be a competent report of the sequence of events, made in the regular course of business and required to be so made.
A detective assigned to the case testified that, as part of his regular and required procedure, he interviewed claimant in the hospital and also interrogated the three witnesses whose names had been listed on the police “ Aided ” card. From the descriptions given him, he deduced that the assailant might be a patient on leave from a mental hospital in the area. He contacted such institutions, investigated the replies he received, and learned that one patient answering the description given to him had been on home leave from Central Islip State Hospital at the time of the shooting.
He stated that one other witness had telephoned the police to inform them that he had seen the assailant. The detective said he obtained a photograph which this witness identified. Together, they visited Central Islip State Hospital and, according to the detective, this witness there confirmed the identity of the suspect by viewing him and inspecting and recognizing clothing worn by him on the day of the shooting.
The detective, armed with a search warrant, then visited the home of the suspect’s parents, and found in the son’s bedroom two newspapers, one of which contained an account of the Orman shooting, and the other an unrelated account of the killing of a subway change booth clerk by a mental patient a few days later. The detective stated that he also found there a subway route schedule and station layout. He added that the actual gun used in the Orman assault was never found.
This witness stated that an arrest warrant was issued on January 19, 1967 and the suspect was taken into custody. An indictment for felonious assault was returned by a New York Grand Jury which the detective believes is still current, although he has no further knowledge of the present status of the case.
The witness who had telephoned the police then took the stand. He testified that while he was ascending the subway stairway at 7:45 a.m., he noticed a metallic glint at his eye level, and heard a shot fired. He stated that the assailant was two steps below bim when the shot was fired and the victim was four steps above him, at that instant. He added that it all happened very quickly, and that he ran to the token seller’s booth, told the clerk what *340 he had seen, left his name and address, and proceeded to work. His description of the assailant matched the suspect’s appearance in the clothing worn and the description of it given by nurses in Central Islip State Hospital. For example, the witness did identify as the coat worn by the assailant the coat which the Central Islip nurse said the patient carried over his arm when he went on leave on December 12, 1966.
The witness confirmed the detective’s account of their visit to the State hospital. He said that he was 75% to 80% certain of the identity of the assailant and had so stated before the Grand Jury. He amplified this by saying that he was “ reasonably sure but not positive of the identification ”.
Mr. Orman testified that he is now 36 years old, and at the time of the assault he was living in Far Eockaway with his wife and two children. He said he was on his way into town on the subway dozing off and that he had no trouble in the subway or on its stairs and that he never before saw the figure that fired the shot. He confirmed the circumstances as recounted by the detective and the witness, adding that he had left his home at 6:45 a.m. and that the stairway leading to the upper level of the Broadway and Nassau Street station was very crowded at 7:40 a.m. as he mounted it. He heard a loud noise as he reached the top landing, spun around and fell down on his back. He noticed what looked to him like a man wearing a hat running down the stairs, but was unable to identify the figure any further.
Claimant said he was in severe pain. He tried to get up but could not, and was carried out on a stretcher into an ambulance. His recollection of subsequent events was hazy, but the BeekmanDowntown Hospital record indicates that Mr. Orman was X-rayed, and that a bullet was detected lodged in the lower spine. That same day claimant was transferred to University Hospital.
A decompressive laminectomy of the spine was performed with debridement of the bone fragments and the bullet wound. It was the opinion of the surgeons and neural specialists that the bullet could not be removed without further damage, and that the paraplegia of both' limbs is permanent and irreversible. Mr. Orman was transferred to the Eusk Eehabilitation Institute on February 13, 1967 and remained there nine months, making occasional visits home during that period.
Claimant’s surgeon testified that subsequent operative procedures, including a phenol block intended to relieve the pain Mr. Orman experiences in his lower body, were performed. He has continually taken medication for the same purpose, but he finds little relief. He attempted the use of braces but found the pain during such use unbearable, and now is confined to a wheel *341 chair. He suffers from prolonged sitting and has no surcease from discomfort. The doctor testified another phenol block may have to be undertaken.
Other tragic effects of this brutal assault include claimant’s inability to continue working as a draftsman at which work he was receiving increased salary and responsibility, the disruption of his family life culminating in legal separation from his wife and children except for occasional visitation by his children, and a depressed state of mind requiring psychiatric care.
The father of the suspected assailant testified that his son was born in 1926 when the family resided in the South, and that his first entry into a State institution was in 1950 when he was admitted to Central Islip State Hospital from Bellevue. Prior to that time the father had never noticed any indication of mental disturbance.
He said that his son had remained in Central Islip for the next 16 years, with occasional home visits. He added that either he, his wife or his nephew would call for his son at the hospital on such occasions and escort him to their home, returning him to the hospital when the visitation period had ended.
The hospital record includes references to a series of insulin treatments during 1951, shock treatments in February of 1952, and psycho surgery by way of a bilateral prefrontal lobotomy performed in March, 1952. These procedures were approved by the patient’s family as therapeutic in nature and intended to improve the patient’s condition.
In later years, tranquilizing medication was used. The record indicates that he was “ neat, clean and cooperative.” “ Patient is quiet and well-behaved, no management problem on the ward. He works regularly on the mail truck and does a good job.”
The father stated that he requested a home visit for his son in December, 1966 to attend the funeral of an aunt. The visit was authorized. A cousin called for the patient at the hospital. So far as the father knew, his son was not then on any medication and he knew of none being supplied nor taken by his son during his leave. He added that his son attended the funeral and was not noticeably upset by it, having attended previous family funerals without incident.
A licensed physician, a psychiatrist on the Central Islip staff for the past 12 years, testified about the medical record of the suspect, which diagnosed him as a catatonic schizophrenic. The doctor had studied an examination before trial of a supervising psychiatrist no longer with the hospital but assigned in 1966 to the building where the suspect was quartered at that time and *342 responsible for the evaluation of patients’ behavior and the granting of ground or visiting privileges, etc.
The testimony of the present psychiatrist in charge, as well as the examination before trial of his predecessor, shows that the suspect had been regularly granted home leaves, had been given an honor card with ground privileges, had been reclassified from a “ certified ” to a “ voluntary ” status in August of 1966, and that the testifying psychiatrist had granted the patient a 28-day home leave on December 12, 1966, from which he returned on January 8, 1967.
This medical witness also stated that the medication prescribed for this patient, 50 mg. of Taractan and 2 mg. of Stelazine taken twice daily, was a light dosage, and, if not taken, would have no effect on the patient’s mental condition. The patient’s father had stated that he had not seen his son take any medication during the Christmas, 1966 home visit.
In order for claimant to prevail in this action for negligence he must demonstrate by a fair preponderance of the evidence that the release of the patient on a home visit was contrary to sound medical judgment. Preliminary to this requirement, however, claimant is obliged to establish that this suspect did, in fact, commit the brutal assault.
The unresolved question as to the guilt of the accused defendant sharpens and makes more difficult the determination as to whether the responsibility rests with the State for the tragic physical condition in which claimant presently is, as well as the responsibility for his changed future prospects.
The normal procedures following an indictment were not followed in the defendant’s case, the trial having been postponed and the matter left undetermined by the finding that defendant required transfer to Matteawan State Hospital, an institution for the criminal insane. Thus there is no decision as to the perpetrator of the crime against claimant. Claimant’s counsel would have this court make that finding.
Necessarily such a finding could be premised only on the evidence adduced at this trial. Here no positive identification was made of the assailant by the claimant nor by the witness who heard the shot and saw the flash from it. No other witness testified to the hideously effective attack. The court is sharply aware of the enormous and dismal disadvantages and handicaps under which claimant has lived since that day, and also of the grim realities of his future existence.
The court takes judicial notice of the difference in degree of proof required in a criminal case, where the prosecution has the burden of establishing guilt of the defendant beyond a reason *343 able doubt. Such proof is not the requirement in civil actions, in which a fair preponderance of the credible evidence is sufficient to establish liability. The court finds controlling the decisions cited in Abbotts New York Digest 2d (vol. 9B, p. 532) which held that:
In administration of law, court must be satisfied with proof which leads to a conclusion with probable certainty where absolute logical certainty is impossible, and, if court is constrained to act upon incomplete evidence where complete evidence is impossible, logical probative force of evidence produced is measured, in part, by test of whether such evidence is the best evidence available. (George Foltis, Inc. v. City of New York, 287 N. Y. 108.)
Existence of a fact is not established by evidence, which does not render existence of fact more likely than its non-existence. (Matter of Erin Wine & Liq. Store v. O’Connell, 283 App. Div. 443, affd. 307 N. Y. 768.)
In order that conclusion of fact may be legitimately drawn from probabilities, probabilities must be such that conclusion is acceptable to judgment of court or jury. (Matter of Erin Wine & Liq. Store v. O’Connell, 283 App. Div. 443, affd. 307 N. Y. 768.)
Money damages could only lessen the catastrophic results of the assailant’s act to a minimal degree. To the degree to which such damages could ease the physical discomfort, they would be a factor in claimant’s life and also serve as a substitute for his curtailed earnings and help to meet his medical costs and his family responsibilities. For such damages to result from this claim the State must be found negligent and its negligence to have been the proximate cause of the attack of which claimant was the innocent and unprovoking victim. The evidence adduced does not support such findings since the proof does not warrant the court to hold that the patient on leave was the assailant. This determination would not affect the trial of the patient when and if he is found able to be tried nor would it affect the decision thereon.
On October 23, 1965 the Governor of this State appointed a special committee to develop legislation to aid the innocent victims of crime. Thereafter, following the committee’s report and the Governor’s request that victims of crime be recognized as a responsibility of the State, legislation was enacted providing for the payment of financial compensation to the innocent victims of violent crime. (L. 1966, ch. 894.)
Under the legislation amending the Executive Law (third article 22, § 620 et seq.) and setting up a Crime Victims Compensation Board, ‘ ‘ crime victims and their families would be *344 eligible to receive, from the State, compensation both for out-of-pocket costs and for loss of earnings or support.” (August 1, 1966 Memorandum approving legislation, signed by Governor Nelson A. Rockefeller and filed with Assembly Bill, Introductory Number 5335, Senate Print Number 6124.)
The act took effect August 1, 1966 but applied only to claims resulting from crimes committed on or after March 1, 1967. Regrettably, claimant is therefore ineligible to presently apply for benefits under this enactment, although the circumstances of the crippling injury to an innocent victim fall precisely within the purview of the legislation. At this time only special legislation could bring the claimant within the new and important law.
The court’s deep sympathy and concern goes out to claimant, victim of an assault which has had so dreadful a result to him and to his family and has caused heavy emotional stress as well as burdensome financial costs. The court must accept medical decisions made by doctors in their professional discretion, and may not substitute for those decisions its own medical judgment, but has not gone into the question since it cannot on the evidence find the patient to be the assailant.
It has not been established to the court’s satisfaction that the suspect was, in fact, the prepetrator of the assault, nor that the pattern of regular home visits by the suspected patient or the lack of proof as to regular medication constituted negligence on the part of the Central Islip Hospital medical staff.
An unbroken chain of causation is a necessary antecedent to liability, and the burden of proof is claimant’s. The test is whether the acts or omissions were the proximate cause of the unfortunate result. The court finds that the State’s liability has not been demonstrated by a preponderance of the credible evidence and must, therefore dismiss the claim.
The State’s motion to dismiss the claim for failure to preponderate, made at the conclusion of claimant’s case, on which decision had been reserved, is now granted. The claim is dismissed.